May it please the Court, my name is Henry Letterman representing the appellant Archstone. The key to finding the existence of a contract here really starts with Mr. Ashbey's affidavit submitted below at SCR1, paragraph 6. In that document, I guess it's a declaration, but nonetheless, in that document, Mr. Ashbey concedes in paragraph 6 that every year he would receive a copy of the personnel manual. And he attaches to the declaration what he calls relevant excerpts. In the attachment, which is a table of contents, is a reference on page 20, as indicated in that table, to the dispute resolution policy. In the acknowledgments of receipt that Mr. Ashbey signed in March of 2009 and in March of 2010, the company called Mr. Ashbey's attention directly to the fact that there was a dispute resolution policy in the manual. The acknowledgment said that it was his responsibility to adhere to all the policies in the manual. The court below, however, relied on three words within a sentence in a different part of the acknowledgment addressing at-will employment. And the sentence said that there is nothing in this agreement or that this is an employment at will. The agreement doesn't make a contract or any kind of contract. And then the next sentence says, and you're employed at will. The reference to any contract has been used to essentially eliminate every possible contract that could grow out of that handbook. Let me ask you something. Sure. Are we talking about the handbook or the policy manual? Well, the handbook and the manual. I'm using the words interchangeably. The handbook contains the dispute resolution policy. I understand that. But what he what he acknowledged receiving was the policy manual. Correct. Now, let me ask you this. Concentrate, if you would, on the policy manual. Others in the arbitration provision in the policy manual, the dispute resolution policy. Are there any other contract rights created, such as will he get paid money? Will he get paid at a certain time of the year? Does he have a vacation schedule? Vacation in particular. Under California law, vacation depends on the contractual arrangement between the employer and the employee. It's not just a suggestion that will pay you, you know, maybe, maybe not, because there's no contractual commission. Mr. Littleman, may I please get you to tell me how many contractual rights you claim there are in the policy manual, other than the arbitration provision? I think the contractual rights in the manual are embodied in all the terms of the manual. So if the manual promises something, the employer is bound. If the manual requires. But I'm asking you, this manual, besides vacation time, does it deal with payment of wages? I would have to look at the table of contents. It's at SCR three. And the reason I ask that is because it occurs to me that a judge Carter's interpretation of this contract is correct. And the phrase no contract rights are created. Then Mr. Ashby had no contract rights to vacation or payment of wages or anything else. Well, that's exactly our point, that if you accept the lower court's characterization of the phrase contractual rights of any kind, that would eviscerate every possible right that Mr. Ashby had described in the manual. Would his rate of pay and his vacation have been specified to him when he first came on board in 1996? I do not know that. What I do know is that every year, according to Mr. Ashby, a new manual was issued. He acknowledges he received it. Right. But the manual might simply memorialize something that he had agreed with. Presumably when he came in and interviewed with Archstone in the first place, they said we're going to pay you whatever it is, $50,000 a year, and you accrue vacation at this rate. I'll get an offer letter to you in the mail. Please let us know within a couple of days. And then the manual may just simply memorialize something that they've already agreed to in other ways. That, of course, is possible. But when you look at this table of contents, for example, on page 84, it does have a provision regarding compensation and time off. Does it provide a rate of pay? I do not believe the manual provides a rate of pay. But that's whether that's a lie. Could it change his rate of pay from year to year as the manual came out? Employers have that right to adjust the rate of pay. That's not my question. My question was did the manual change the rate of pay from year to year? I do not see that one way or the other in the record. Could it change the vacation, his vacation rate? It could. It could not, however, eliminate vested vacation time. So, for example, if Mr. Ashby had accrued. Could it change in the future his rate of vacation? If he was entitled to four weeks of paid vacation per year, could the next iteration of the manual say, well, we've decided to reduce that to three? Yes, it could. The four, if he'd already accrued four, they couldn't take that away from him. I understand. It's been accrued. Right. But this next year, you're only going to get three years. Yes. Does that give him any kind of notice? It has to provide him with a copy of the new rule. The reason that they can make this change is because he's an at-will employee, so he sort of has to take or leave whatever they offer him? I don't think it necessarily depends on his at-will status. However, on the asthma's case, at-will is just another term of employment. At-will says, instead of requiring that we terminate you for just cause, or instead of saying that you have a contract for two years to work here, at-will says, as a term of employment, you can quit at any time with or without notice and we can terminate you at any time with or without notice. It also presumably means that for some particular term, that he's going to get whatever the pay is that they've agreed. Exactly. But then the company can say, look, we've reevaluated things, don't think you're worth as much as you were or we're on hard time, so we're going to reduce your salary by $10,000 a year, take it or leave it. Well, yes, and as long as he remains employed after notice of the new terms and conditions of employment under the asthma's case, he's bound. Because your position is that he's accepted that offer by continuing to work? Well, what asthma's holds is that continuing employment is adequate consideration after notice of the new term and condition. So where's the acceptance? Isn't it manifested by his continued? Yes, if you want to look at it that way. But they say his decision to remain employed is adequate consideration for the company imposing a new term. And so, you know, under contract law, there's grudging acceptance. If they say, you know, we paid you $50,000 a year, we think you're only worth $35,000 a year, that's where we're changing your pay to effective January 1, here is your notice. If he elects to remain employed after that, after notice, he can't come back and say, no, I earned $50,000 a year. No, you've accepted the $35,000 by electing to remain employed. That is what asthma's was all about. But they simply put out an employee manual that said, here's the schedule of pay for certain pay grades, kind of like we do in the federal government. You schedule something and just publish the schedule from year to year without drawing anybody's attention to it. Well, if they didn't, if it was a secret schedule and he didn't. It's a big thick manual and it's just buried in there. Nobody's drawing anybody's attention to it. Well, you're drawing attention to it if you're given a copy of it and drawing attention to the facts of this case. Mr. Ashby admits at SER1 paragraph 6, every year I receive the copy of the manual and attached is a relevant portion of the manual. And lo and behold, it's this table of contents which talks about compensation. It says generally each year, right? Generally each year. Well, we know at least for the years in question, 2009 and 2010, Mr. Ashby signed an acknowledgment of receipt and was told you need to adhere to those policies. Was there anything in the transmittal of that manual that said, and by the way, you ought to be aware, here's a couple of interesting points that we've made? Yes. In fact, in the record is a reference to a memo. It's at ER78 that was distributed to employees with a 2009 manual and said, oh, we have a new policy for alternative dispute resolution. And in that policy, you and the company agree to utilize an outside arbitrator to resolve disputes. That's at ER78. In addition to that, that same year, 2009 is when they introduced the policy, Mr. Ashby signed an acknowledgment saying I received it, I'll adhere to it. It called his attention to the fact that there was a dispute resolution policy. And in 2010, they did it again. And Mr. Ashby, one of the arguments he makes is, oh, this is surprise. And he bases it on the fact that the handbook was long. If you accept that argument, first of all, that singles out arbitration, that somehow there has to be greater notice for arbitration. And that is not the law ever since Doctors Associates. Counsel, let me ask you a different question. Sure. Your position is that the. Three words about no contract rights really should be interpreted in context with the statement of appointment of will before and employment of will after. Under the Latin canon used to which is birds of a feather flock together so that you have to take that into context. I take it you're saying then under California law, interpreting contracts, written contracts were to take this as a plain meaning contract. You don't admit that it creates any ambiguities. Oh, I don't. I don't think we we need to make that argument. And we don't. If it is ambiguous. First of all, if it's in context and the Latin maxim applies, then, yes, it refers to at will employment as a matter of construction. And it's plain meaning. Yes, you can take it that way because the plain meaning is defined by the context in which the phrase appears. All right. And any contractual rights in that context refers to rights other than at will employment, rights relating to just cause, rights giving you a term of employment. That's what that refers to. But even if it were ambiguous, even if the California Supreme Court's Pearson Dental case and the other civil code provisions we cite, 1643 and 3541, address that very issue. Pearson Dental says, look, we're trying to evaluate these contracts to make them work. Something that makes enforceable rather than void is preferred. You lay on top of that the federal policy under the Federal Arbitration Act. We like arbitration agreements.  The case applies to the Bank of the West. You have plain meaning. If it's a big ambiguity, then you go to the objectively reasonable expectation of the promisee. If that still is ambiguous, you go to the contra proferentum or against the drafter of the policy rule. You agree with that? Well, the third one is a rule of interpretation, not a rule of formation. The issue here by the lower court was, was a contract even formed? And the lower court said no contract was ever formed because of these three words. And when you juxtapose those three words against the arbitration policy itself, let's talk about, you know, what we're talking about. Is this policy a contract? Policy is very clear in mandatory terms that the parties, if we have a dispute covered by the agreement, are required to arbitrate it. And if we have that dispute, we shall select an arbitrator. I see I'm running out of time, unless there are other questions. You can reserve the remainder of your time, and I will afford you some time for rebuttal. Thank you very much. Good morning. If it may please the Court, my name is Avi Berkowitz. I'm on behalf of the respondent, Michael Ashby, and I am going to be splitting my time with Ms. Oxford over here as well. Okay. And you've afforded her five minutes. I have. Okay. So you'll need to stop then when you have five minutes on the clock, otherwise you're going to eat into her time. I will watch that clock like a hawk. Actually, I'd watch the one right in front of you, the red one. I'll watch both. Thank you. Okay, good. The declaration that counsel has made it noted to specifically states generally each year. And the key here is that that last sentence there, or the second-to-last sentence, reflects that Mr. Ashby did not receive the manual in 2009 and 2010. I mean, that's key. We're talking here about a contract formation. That's really the main issue in this case. Was there a contract? Counsel has characterized this acknowledgment of receipt of manual. There's no receipt. It's an acknowledgment about how to access a computer, Internet site. There's no acknowledgment of the use of a handbook. There's no acknowledgment about the use of arbitration. This document is completely silent with respect to arbitration. But as companies move to more online stuff, this looks to me like the contract of adhesion that you fill out in your hotel to acknowledge that you've read the policy before you access their Wi-Fi. That's the fair example, Your Honor. But in this instance, we're talking about here's how you access something. Okay. Then when you access it, there certainly would be a handbook that would say, please sign this. Where is that sign? Where is that signature reflecting? Do you want the digital signature that says I acknowledge that I've read this? I think that's a starting point. The checkbox. I'm sorry? The checkbox. Yes. I think if you had a checkbox like on a computer screen where it says I have read, you have something. All you have here is I now know how to access this thing in the hotel. That's great. It doesn't say that I'm now bound to pay $50 for that movie that I just saw. I don't know how much movies are now, but something around that. The point is you don't have anything there. Read the rest of that paragraph. I understand that it is my responsibility to understand the arched stone company policy manual, including this resolution policy, and to adhere to all of the policies contained therein. They're telling him this is the manual, this is where you can find it, and you agree to get it and read it, just like Judge Biby said we do in our hotel. Well, isn't that a binding acceptance of the contract? No, and I'll tell you why, for two reasons. Number one, all he's being saying is to review a handbook where there is some type of arbitration policy embedded in there. But second, here's the more important point. For a waiver of a Title VII claim like this, there needs to be a knowing and voluntary waiver of an ADA claim or of a Title VII claim. And the cases that the brief cites with respect to whether you want the Prudential case, the Nelson case, those cases talk about knowing and voluntary waivers. That's not knowing and voluntary waiver here. Well, it doesn't use the word waiver, but it says he would adhere to all of the policies contained therein. There's no question that therein refers back to the company policy manual, including the dispute resolution policy, right? Right, but he is not knowingly in waiving arbitration, I'm sorry, a jury trial, a constitutional right to jury trial, by just basically saying I'm familiar in knowing and will adhere to policies including vacation, including everything that could possibly be under the sun with respect to that handbook. And dispute resolution policy can also refer to many things. It doesn't necessarily mean arbitration. Does Mr. Ashby have any kind of a separate contract with the company? No. Anything he ever signed, anything he ever received when he first started in 1996? It says, look, we're going to start you at $40,000 and you get two weeks vacation. I'm sure I would surmise that when he started he would be signing saying I have understood these policies, I have understood these, but there was no contract saying I'm going to work for five years or something to that effect. What established his rate of pay? A rate of pay would be something that would be either signed off on or the actual paycheck itself where he's getting a paycheck and he is continuing to work for that amount of money, understanding that's how much pay he's getting. I'm asking a different question. I think Judge Bybee is too. When he started work, was there anything indicating, other than this manual that he generally received each year and which doesn't say we're going to, it's not personalized, right? It didn't say that we were going to pay your client a certain amount of money, did it? I don't know the answer to that question. I just don't. Okay. So how should Archstone have handled this with respect to this change in the dispute resolution policy? What should it have done? Okay. What they could do is what I'm sure their other clients do in other cases. You have a handbook. You give the handbook to the employee. The employee signs the handbook, preferably signs off on an arbitration agreement as well as part of that handbook. You don't have another piece of paper saying this is how I have access to something without mentioning arbitration. What if they want to do it digitally and they don't want to kill as many trees? Can they put it on their website and go the checkbox route to indicate that this individual has received notice? Certainly that's a different case, and if that was this case and it was arbitration and things that were knowing and involuntary waivers, I wouldn't be standing here making these arguments. But, yeah. So if this had just been the acknowledgement that they knew how to get to it and they had some evidence that he had accessed it, or if it said here something like, and it will be my responsibility to go there and check the box before I get my next paycheck, and they had some evidence that it checked the box, it says I not only received this thing, but I'm telling you I've read every word in this manual, just like you do with, you know, I've checked it a hundred times and I'm sorry to say I've lied. I'm not actually reading the whole thing. The part that says I read the whole thing? Yeah. I didn't read everything. And check the box. Then can they alter the terms of his contract? And that would be acceptable to you? Depends on what altering the terms of the contract are. It changes his rate of pay. It changes his vacation schedule. It changes the way in which he agrees to arbitrate any disputes that he has. Does he have to sign off on each individual change, or is it enough that he now says, they've said here's what the terms are going to be for the next year, and if you show up at work on Monday and you've read the policy, then we assume that you've agreed to do this. You've got a problem? Better come in and see us. Certainly, I'd have to concede that they can make changes without a signature on every single thing when it comes to whether vacation. They can make changes. They can, of course. But when it comes to arbitration, we're talking about more of a fundamental right. It can't. That's my argument. So he would have to sign off specifically on the arbitration? I would think that at the minimum he would need at least an acknowledgement that he signed off. The arbitration would be more important to him than, for example, a change in his vacation schedule or his rate of pay. Perhaps it would be more important to him. Certainly it is right now because here we are and he's been terminated, and he has to get this case in front of somebody, and he wants it in front of a jury. So right now at this point, it is more important. Do you have any case which says that the employee must sign an arbitration waiver provision in order for the arbitration provision to be valid, as opposed to not having to sign off on whether his pay schedule is a certain amount, whether he gets vacation, whether he gets pension, whether he has any disciplinary rights to a hearing? You're saying there's something peculiarly important about arbitration which requires a specific waiver? Yes. Which case is that? The case is Nelson, Sparks, Prudential. And what do they say? They say that there needs to be specific waiver when it comes to arbitration, whether it's the ---- Specific waiver when it deals with arbitration. It has to be in writing and it has to be a waiver. It has to be knowing, voluntary, and everybody who can read it will understand what it means. Is that what you're saying? I'm not saying that for every case, but I'm saying that these different cases talk about waivers of arbitration specifically. All right. I see my time is up. Yeah. Well, you have one more minute if you want to take it. Otherwise, you can cede it all to Ms. Oxford. If there's any other questions, then I cede my time. Okay. Thank you, Mr. Berkowitz. Thank you. May I please the Court? My name is Susan Oxford. I represent the Equal Employment Opportunity Commission as amicus curiae in this case. And to address a few of the questions that the Court has raised so far, email notification and acceptance has been recognized by the First Circuit as a means of accomplishing an arbitration agreement. In Campbell v. General Dynamics 407 F3rd 546, in 2005, the First Circuit recognized that this would be feasible. They found that the company had not done it in that case. Hadn't gotten. Can you remind me in that case? I think I looked at it. Is the question, is the problem getting notice or getting agreement? Both of those problems were present in Campbell. In that case. Yes, they were. In this case, if they had given him email notification, what they gave him was something that said, we've changed our policy and you can find it over here. If he'd gone over there and they'd had a checkbox indicating he'd just received notice, would that be enough? That would be one way for the company to prove that he had, depending what the notice said. Now, there's several problems or several considerations. One is any notice he received that said you can go over here to find the dispute resolution policy and then a check that he found it. If it was accompanied by language in the same document that said, but this does not create any contractual rights, that would negate. Then his check would only indicate that he had received something that he had been informed by the company was not contractually binding.  So what if my hypothetical is. What would be the purpose of that? And I'm glad you raised that because if you look at the table of contents of the manual, which is found at SER3 and on, there are over 100 pages. It lists a number of policies and expectations the company has of employees, and it has asked its employees to agree to all of these, including a policy about weapons in the workplace, violence in the workplace, time in attendance, which presumably says you have to show up at your assigned hours and call in sick when you're sick. All of those employees are asked to agree to them, but none of them are a contractually binding agreement. So if an employee does not adhere to the call-in policy for sick, the days they're sick, doesn't show up on time, the company can discipline them. They could even fire them if they're not happy with the response. But they cannot seek specific performance through contract. They couldn't seek contractual damages for failure to show up on time or failure to call in when you're sick. And that's the difference between establishing policies and telling employees, you must agree to abide by these and entering into a. Provision. Confidentiality provision? I don't recall. I just have the tabled contents here, and I think there's something about some provisions of respecting people's privacy, but I don't know the exact. Well, suppose there were a confidentiality provision saying you can't give our trade secrets to anybody. That could be enforced by specific performance, could it not? I would suspect that that would be something the company would actually enter into a contract with. Well, but if it has in a policy manual that particular provision, what's to say that that's not a contract between Mr. Employee and the company? It might be a contract if the company designated it as such. The problem here is the language the company chose to use. For instance, if we look and we reprinted this language for the acknowledgement form at pages five to six of our brief, the company says, I understand this company policy manual does not alter the employment at-will relationship or create any contractual rights, so separating out something separate from at-will employment. If instead this language had said, or create a contractual right to keep my job, then it would just be restating it doesn't create an at-will. They could have said that.   or create any contractual rights, other than the obligation to arbitrate my job. Your position is that the language, or create any contractual rights, means that the policy manual itself creates no contractual rights. Exactly, yes. And if you look at page 12 of Archstone's opening brief, at the top of that page, they concede that that language, or create any contractual rights, has to refer to something other than at-will employment. Otherwise, it would be mere simplicity. So your position, and I'm being somewhat facetious, is they can fire him for not adhering to the arbitration policy, but they can't collect damages or specific performance. Yes, although I would qualify that if it turned out that that was a retaliation against asserting your rights under Title VII, then perhaps they couldn't. But, yes, say if he had a simple dispute over the rate of pay that had nothing to do with any of the protected categories of Title VII, yes, they could fire him for not adhering to the arbitration policy. And companies have accomplished binding arbitration agreements with their employees many times. If you look at Craig v. Brown and Root, which is a case that Archstone relies on, there the company distributed a brochure describing the dispute resolution program. It said in capital letters on the acknowledgment form that the employee received, this applies to you. Take the time to read this. It will govern all future legal disputes between you and the company. That's pretty plain that they are entering into a binding agreement there. That kind of language is what companies use all the time to create mandatory arbitration agreements. But where a company has not created such a binding obligation, it is critical that the employee be allowed to select the form of their choice. And if they choose to bring their employment discrimination claim before a jury and before a Federal judge, they should be allowed to do that. And that's the significance of this Court's jurisprudence on the knowing involuntary waiver under Title VII in the ADA, which is still good law in this circuit, that Congress has said arbitration agreements can be used in the employment discrimination context where appropriate. And this Court has said it is appropriate only if the individual has agreed to that in a knowing involuntary waiver of their right to go to court. What's that take? What's the knowing involuntary waiver? What's that take? What does it take? It takes that the employee is being told that they are giving up their right to go to court and that they will instead be required to arbitrate. Going back to the dispute policy says? No, it doesn't. The dispute policy, well, the policy itself, yes, the policy itself. But the Mr. Ashby did not sign the policy and he did not even sign that piece of paper that the company says was at the beginning of the policy manuals in 2009 and 2010. He acknowledged the receipt of the company policy manual, which specifically said in the acknowledgment that this had a dispute resolution policy, right? He acknowledged receiving instructions on how to access it. How to go find it. How to go find it. So here's my question I keep trying to get answered. If they had given him this piece of paper, the very piece of paper we're talking about at ER. ER 81. 78. Oh. No. Yes. Forgive me. If they give him the piece of paper that had said here's how you can go find it on the website. Oh. And it's your obligation to go find it. The acknowledgment form. And he'd gone to that website and checked a box indicating he had received it. Would that have been enough? He kept working under those conditions. Would that have been enough? Not if it did not also say that he received the policy which itself says it's mandatory. Mandatory arbitration. I think that would satisfy the contractual requirements of California law. And I'm not sure that this would satisfy this Court's requirements for knowing involuntary waiver. Thank you. You're well over your time. Oh, I'm sorry. I apologize. We thank you, Ms. Oxford. Thank you for your argument. Mr. Letterman. Thank you. The knowing involuntary waiver is from older cases. Those cases, I don't think the Court needs to even address that issue because on E.R. 81, there is a knowing involuntary waiver. Among the various claims listed as being covered by the arbitration agreement are claims under Title VII, Civil Rights Act of 1964. Mr. Ashby's declaration is, I'd say, carefully worded, but he does admit to generally receiving these manuals, and I think the proof of the pudding is in the tasting. He then attaches something he received, which is the table of contents from the manual at S.E. 3, which specifically refers to the dispute resolution policy, which we know was new in 2009. Yes? Isn't opposing counsel right about the statement at the top of page 12 of your brief? How would you have us interpret the phrase, any contractual rights, that your client drafted? Well, on page 12, it says, the only proper interpretation of the phrase, any contractual rights, is that it refers to rights other than at will employment, not any contract at all. So I think the interpretation of that sentence is that a right other than at will employment, as I mentioned in my opening, is a right for a contract for a definite term, or a right that I will not be fired unless there's just cause. The sentence read in its entirety doesn't say it refers to all other possible contractual rights. In fact, it specifically disclaims that that's what it means. It says it refers to rights other than at will, not any contract at all. If we were to go into court, if Mr. Ashby had a vacation pay claim after his termination, say, hey, you owe me three weeks' vacation. And we said, oh, no, look, we said any contractual rights at all, we'd be laughed out of court, rightfully so, because the vacation pay is a contractual commitment within the manual that Mr. Ashby is now contending creates no contract at all. What prevents the, without the checkbox, even doing this digitally, without the checkbox, where do you have indication that he's received this change? You know, it's why when there's a 100-page document and we circulate it to each other, it's always in red line. It doesn't seem, where's the notice that he had this very significant change to his employment contract? Well, he had the acknowledgment forms that he signed in 2009 and 2010. He says in paragraph 7. They don't say arbitration. Yes, they do. They refer to dispute resolution policy. That's not arbitration, sir. Well, that's what it was. That's what it is in this contract, in this handbook. The dispute resolution policy was the policy requiring arbitration. And he admits, at least he got the table of contents, and he attaches that, so presumably he got what was attached to the table. And furthermore, in the Lynch declaration, we do say we distributed it. So he did get it. He never denies that the acknowledgment was validly signed. He doesn't say that it's a forged signature. He concedes that the acknowledgment form says what it says, that I have to adhere to these policies. One of them, singled out, is a dispute resolution policy. Under the San Francisco newspaper case, which you cite in our reply brief, it's a good case for us for several reasons. One, it specifically says, if we allowed the adhering party, that's its words, adhering, which is the same word used in our acknowledgment form. If we allowed the adhering party to a contract, say, well, I'm not bound because I never read it, that would destroy contracts. You can't do that. I mean, plainly this was distributed. Plainly he was told where to go to get it. And you can certainly, should be inferred from his affidavit that he did get it, because he has the table of contents showing dispute resolution policy. Under the Madden v. Kaiser case, California Supreme Court, it is unnecessary to specifically make references to abandoning a jury trial or anything like that. The policy speaks for itself. It says if we have a dispute, we will arbitrate it. We will not go to court. We will not have a jury. Thank you, Mr. Letterman. You're welcome.
judges: Bybee, Bea, Christen